UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TERENCE ALVIN JOHNSON,

        Petitioner,

        CASE NO. 2:09-CV-10395

v.        CHIEF JUDGE GERALD E. ROSEN

        MAGISTRATE JUDGE PAUL J. KOMIVES

JEFFREY WOODS,

        Respondent.[1]

_____/

## REPORT AND RECOMMENDATION ON PETITIONER'S HABEAS APPLICATIONS (docket #1, #15) and MOTION FOR INVESTIGATIVE ASSISTANCE (docket #20)

| | | | |
|---|---|---|---|---|
| I. | | RECOMMENDATION | | 2 |
| II. | | REPORT | | 2 |
| | A. | *Procedural History* | | 2 |
| | B. | *Factual Background Underlying Petitioner's Conviction* | | 5 |
| | C. | *Standard of Review* | | 10 |
| | D. | *Self-Representation (Claim I)* | | 12 |
| | | 1. | *Clearly Established Law* | 12 |
| | | 2. | *Analysis* | 13 |
| | E. | *Other Acts Evidence (Claim II)* | | 17 |
| | F. | *Prosecutorial Misconduct (Claim III)* | | 20 |
| | | 1. | *Improper Statements* | 20 |
| | | | a. Clearly Established Law | 20 |
| | | | b. Analysis | 21 |
| | | 2. | *Perjured Testimony* | 23 |
| | | | a. Clearly Established Law | 23 |
| | | | b. Analysis | 25 |
| | | 3. | *Suppression of Exculpatory Evidence* | 28 |
| | | | a. Clearly Established Law | 28 |
| | | | b. Analysis | 29 |
| | G. | *Newly Discovered Evidence (Claim IV)* | | 31 |
| | H. | *Ineffective Assistance of Appellate Counsel (Claim V)* | | 36 |
| | | 1. | *Clearly Established Law* | 36 |
| | | 2. | *Analysis* | 38 |
| | I. | *Evidentiary Hearing, Discovery, and Investigative Assistance* | | 39 |
| | J. | *Recommendation Regarding Certificate of Appealability* | | 41 |
| | | 1. | *Legal Standard* | 41 |
| | | 2. | *Analysis* | 43 |
| | K. | *Conclusion* | | 43 |
| III. | | NOTICE TO PARTIES REGARDING OBJECTIONS | | 44 |

_____

[1]By Order entered this date Jeffrey Woods has been substituted as the proper respondent action.

I.    <u>RECOMMENDATION</u>: The Court should deny petitioner's application for the writ of habeas corpus and his motion for investigative assistance. If the Court accepts this recommendation, the Court should also deny petitioner a certificate of appealability.

II.    <u>REPORT</u>:

A.    *Procedural History*

1.    Petitioner Terence Alvin Johnson is a state prisoner, currently confined at the Chippewa Correctional Facility in Kincheloe, Michigan.

2.    On March 10, 2006, petitioner was convicted of accosting a child under the age of 16 for immoral purposes, MICH. COMP. LAWS § 750.145a; and second degree criminal sexual conduct (CSC II), MICH. COMP. LAWS § 750.520c(1)(a), following a jury trial in the Macomb County Circuit Court. On April 13, 2006, he was sentenced to a term of 2-15 years' imprisonment on the CSC II conviction, and to a concurrent term of 2-4 years' imprisonment on the accosting a child conviction.

3.    Petitioner appealed as of right to the Michigan Court of Appeals raising, through counsel, the following claims:

    I.    DEFENDANT'S CONVICTIONS SHOULD BE REVERSED AND THE MATTER REMANDED FOR A NEW TRIAL WHERE THE TRIAL JUDGE FAILED TO COMPLY WITH MCR 6.005 AND WITH THE CONSTITUTIONAL REQUIREMENTS UNDER THE SIXTH AMENDMENT TO THE UNITED STATES CONSTITUTION IN PERMITTING MR. JOHNSON TO WAIVE HIS RIGHT TO COUNSEL AND TO REPRESENT HIMSELF AT TRIAL.

    II.    THE TRIAL COURT REVERSIBLY ERRED IN OVERRULING THE DEFENSE OBJECTION TO EVIDENCE THAT MR. JOHNSON ALLEGEDLY SEXUALLY ABUSED HIS DAUGHTER AND SON IN PRIOR INCIDENTS, UNDER MRE 404(B), AS THAT EVIDENCE WAS NOT PROBATIVE OF ANY PROPER PURPOSE UNDER THE STATUTE, AND/OR THE EVIDENCE WAS SIGNIFICANTLY MORE

PREJUDICIAL THAN PROBATIVE.

III.     DEFENDANT'S CONVICTION FOR ACCOSTING A CHILD UNDER
THE AGE OF 16 FOR IMMORAL PURPOSES SHOULD BE REVERSED
AS THE PROSECUTION FAILED TO PRESENT LEGALLY
SUFFICIENT EVIDENCE OF AN ACCOSTING SEPARATE FROM THE
ALLEGED CONDUCT THAT COMPRISED THE CRIMINAL SEXUAL
CONDUCT CHARGE.

The court of appeals agreed with petitioner that there was insufficient evidence to sustain his

accosting a minor conviction, and vacated that conviction and the related sentence. However, the

court rejected petitioner's self-representation and other acts evidence claims. *See People v. Johnson*,

No. 270444, 2007 WL 3033950 (Mich. Ct. App. Oct. 18, 2007) (per curiam).

4.       Petitioner, proceeding *pro se*, sought leave to appeal the two issues on which he did

not prevail in the court of appeals to the Michigan Supreme Court. The Supreme Court denied

petitioner's application for leave to appeal in a standard order. *See People v. Johnson*, 480 Mich.

1076, 744 N.W.2d 160 (2008).

5.       On February 2, 2009, petitioner filed an application for the writ of habeas corpus in

this Court, raising as grounds for relief the two unsuccessful claims he had raised in the Michigan

Court of Appeals. On February 27, 2009, petitioner filed a motion to hold the case in abeyance so

that he could exhaust additional claims in the state courts. The Court granted the motion on March

9, 2009.

6.       Petitioner thereafter filed a motion for relief from judgment in the trial court pursuant

to MICH. CT. R. 6.500-.508, raising claims of prosecutorial misconduct, ineffective assistance of

appellate counsel, and newly discovered evidence. The trial court denied the motion on July 19,

2009. *See People v. Johnson*, No. 2005-3139FH (Macomb County, Mich., Cir. Ct. July 19, 2009).

The Michigan Court of Appeals and Michigan Supreme Court subsequently denied petitioner's

application for leave to appeal in standard orders.  *See People v. Johnson*, 488 Mich. 869, 788

N.W.2d 419 (2010); *People v. Johnson*, No. 294492 (Mich. Ct. App. Nov. 17, 2009).

      7.      On October 22, 2010, petitioner filed a motion to reopen his case, along with an

amended petition.  The Court granted the motion to reopen and leave to amend on November 30,

2010.  Petitioner asserts five grounds for relief in his amended petition:

     I.     DEFENDANT'S CONVICTIONS SHOULD BE REVERSED AND THE MATTER REMANDED FOR NEW TRIAL WHERE THE TRIAL JUDGE FAILED TO COMPLY WITH MCR 6.005 AND WITH THE CONSTITUTIONAL REQUIREMENTS UNDER THE SIXTH AMENDMENT TO THE UNITED STATES CONSTITUTION IN PERMITTING MR. JOHNSON TO WAIVE HIS RIGHT TO COUNSEL AND TO REPRESENT HIMSELF AT TRIAL.

     II.    THE TRIAL COURT REVERSIBLY ERRED IN OVERRULING THE DEFENSE OBJECTION TO EVIDENCE THAT MR. JOHNSON ALLEGEDLY SEXUALLY ABUSED HIS DAUGHTER AND SON IN PRIOR INCIDENTS, UNDER MRE 404(B), AS THAT EVIDENCE WAS NOT PROBATIVE OF ANY PROPER PURPOSE UNDER THE STATUTE, AND/OR THE EVIDENCE WAS SIGNIFICANTLY MORE PREJUDICIAL THAN PROBATIVE.

     III.   THE PROSECUTOR'S MANY ACTS OF MISCONDUCT DENIED DEFENDANT DUE PROCESS, EQUAL PROTECTION OF LAW AND THE RIGHT TO A FUNDAMENTALLY FAIR TRIAL.

     IV.   DEFENDANT HAS "NEWLY DISCOVERED EVIDENCE" THAT WAS NOT AVAILABLE AT THE TIME OF HIS TRIAL AND WOULD MAKE A DIFFERENCE UPON A RETRIAL.

     V.    MR. JOHNSON WAS DENIED HIS STATE AND FEDERAL RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL ON APPEAL DUE TO APPELLATE COUNSEL'S FAILURE TO RAISE ALL CONSTITUTIONAL CLAIMS IN THE ORIGINAL BRIEF ON APPEAL.

      8.      Respondent filed his answer on May 27, 2011.  He contends that petitioner's

prosecutorial misconduct claim is barred by petitioner's procedural default in the state courts, and

that petitioner's remaining claims are without merit.

4

9.      Petitioner filed a lengthy reply to respondent's answer on July 14, 2010.  In his reply,

petitioner seeks discovery and an evidentiary hearing.  Further, on January 12, 2011, petitioner filed

a motion for investigative assistance, in which he seeks appointment of an investigator.

B.      *Factual Background Underlying Petitioner's Conviction*

Petitioner's conviction arises from the sexual assault of his then 10-year-old son.  The

Michigan Court of Appeals briefly summarized the facts leading to petitioner's conviction:

> In May 2005, several individuals observed defendant kiss and hug a young
> boy inappropriately while the two were sitting at a picnic table in a public park.  Two
> of the witnesses observed defendant rubbing his groin area outside of his clothing
> while kissing the boy; another observed defendant touching the boy's groin area
> outside of his clothing and telephoned 911 to report the incident.  When the police
> arrived, they determined that the boy was defendant's ten-year-old son.  The boy told
> the officers that he and his father were praying and conducting Bible study at the
> table and did not kiss at all.

*Johnson*, 2007 WL 3033950, at *1.  The evidence adduced at trial was more fully summarized in

petitioner's brief on direct appeal:

> The initial prosecution witness was David Johnson.  He indicated he was
> presently living with his mother and her boyfriend.  His older sister Vanessa lived
> with them at times in 2005.
>
> David stated that he loved his father very much, and missed him.  He stated
> that on the day in question, he and his father rode their bicycles to Rotary Park in
> Roseville.  He indicated they went to the park 2 to 4 times a week, as it was only a
> few houses away from his house.  Mr. Johnson had a Bible with him that day.  David
> testified that he and his father sat at a picnic table in the park, and did Bible study.
> He did Bible studies with his father every day they were together.  David stated that
> his parents did not live together, and that he got to see his father around 20 hours per
> week.
>
> David testified that he sat on both the bench seat and on top of the picnic
> table that day, and that the Bible study took around 25 minutes.  He agreed that his
> father had hugged him a couple of times during that study.  He did not recall his
> father kissing him.  He stated he was playing on the swingset at the park when the
> police arrived.  The police officers spoke to Mr. Johnson, and then to David.  After
> the questioning, he returned home.  He did not know where his father went.  He was
> reinterviewed at a facility named Care House the next day.  David indicated he told
> the people at Care House that his father had hugged him one time at the park, and

that there had been no kissing.

David testified he recalled an incident in January, 2005, when he was in a car with his father parked in the lot of a bowling alley and the police came to the car. The police spoke to his father, and briefly spoke to him. He stated he and his father were doing their Bible study in the car that day, and had been parked in the lot for around 45 minutes before the police arrived. David indicated that his father was wearing black dress pants that day, and he did not look to see if they were zipped or unzipped. David acknowledged being interviewed at Care House the day after the incident in the parking lot, and telling them that his father had just gone to the bathroom and that was why his pants were undone. David denied that his head was ever on his father's lap that day.

David denied that his father had ever touched his private parts, or that he was ever made to touch his father's private parts. He also denied ever seeing Defendant touching his own private parts. David denied telling the prosecutor prior to trial that "probably something did happen," or that his father might have done something to him.

On cross-examination, David clarified where he was sitting at the picnic table. He and his father took turns reading from the Bible during their studies. They would go to a church in St. Clair Shores. David agreed that his father limited what he could watch on television and what type of music he could listen to. David reasserted that Defendant had never touched his private parts. He had not seen or had any contact with his father since that day.

David testified he is four foot, four inches tall, and when sitting in his father's car he is able to see over the dashboard.

Lashawanda Goss testified that she was at Rotary Park with her parents, her fiancée, and her three children on May 26. She stated that in the late afternoon, after she had been at the park for 1 ½ hours, she saw a man who she identified as Mr. Johnson ride a bike into the park. She stated the man appeared to be carrying a Bible, and sat down at a picnic table, where he was approached by a young boy. She believed the boy was in the park already before the man arrived. According to Ms. Goss, she was around 800 feet away, with a clear view of the table. She stated the boy sat on the table, facing Defendant. Ms. Goss asserted that she could see the man and the boy talking, and then she saw them hugging and kissing on the mouth. From her viewpoint, she could see the child's back and part of Defendant's front. She watched this activity for a short time, and then called 911. Ms. Goss stated she believed Defendant's hands were on his own genital area, rubbing himself. She stated that she talked to the police twice over the phone, describing what she believed she was seeing.

Ms. Goss stated that when the police arrived the man and the child went over to the swingset in the park, looking as if they were preparing to leave the park. The tapes of her two 911 calls were played for the jury. Ms. Goss acknowledged that she could not see the child's hands during the incident. She had never seen either Defendant or the child previously. She was aware that there were other people in the park that day, but did not know any of them.

6

On cross-examination, Ms. Goss stated that from her angle she was able to see the left half of Mr. Johnson's face. She acknowledged that she did not see Mr. Johnson's genitals. She believed there were around 30 people in the park at the time. She acknowledged that in her prior testimony she stated that Defendant's Bible was sitting in front of him on the table, while at trial she had stated that the Bible was behind the child, out of Defendant's view. She acknowledged that she did not see Defendant touching the genital area of the child. She did not see either Defendant or his son lying down on the picnic table at any time.

Karen Terlisner, Ms. Goss's mother, testified she could identify Defendant as the man she saw at the park. Mrs. Terlisner stated she saw Defendant "inappropriately" hugging the child and kissing him. She saw the two people talking, but denied that they ever opened or read from the book that the man had carried into the park. She asserted she could see Defendant touching himself and apparently masturbating through his clothing. Mrs. Terlisner stated that Defendant and the boy were still at the table when the police cars first pulled into the park, and only then went to the swingset. She believed she was around 100 feet from the picnic table, with nothing blocking her view.

On cross-examination Mrs. Terlisner acknowledged that she did not see Defendant touch his son's genitals. She verified that she testified at the preliminary examination that she did not see Defendant or his son lying down on top of the picnic table.

Sheletha Jones testified she was at Rotary Park on May 26 with her children. She stated she saw Defendant and his son at the park, sitting at the picnic table. According to Ms. Jones, the boy laid down on the table for several minutes, and Defendant was touching and kissing him. She asserted that she saw Mr. Johnson put his hand on the area of his son's penis. She stated that the kissing went on for approximately 30 minutes. She believed that both Defendant and his son were sitting at the table when the police cars arrived, and only then went to the area of the swingset. Ms. Jones indicated she did not know Defendant or his son, and had never seen them before at the park. She did speak to other people at the park after she spoke to the police. She did not see Mr. Johnson touch himself during this incident.

On cross-examination Ms. Jones stated that the boy was sitting on the top of the table when he was touched, rather than lying on the table. She later stated that he was instead lying down when the touching allegedly occurred.

Vanessa Johnson, age 19, Defendant's daughter, testified that in 1996, when she was nine years old, she would engage in Bible studies with her father. Ms. Johnson asserted that one day in 1996, she was lying on the couch in her house and Defendant lay [sic] down behind her and reached around to rub her stomach under her shirt. According to the witness, Mr. Johnson then moved his hand up and touched her on her chest. She further testified that several years later, after her parents separated, she moved in with her father. She stated that on one date, Defendant started kissing her on her neck, arms, and upper thigh area, just above her knees, and then touched her over her clothing on her vaginal area. She acknowledged that this touch lasted only a few seconds, and that nothing else

7

happened on that date. She asserted that a similar incident occurred in 2001, with Defendant kissing her and touching her briefly on her genital area.

On cross-examination Ms. Johnson acknowledged there was a custody dispute between Mr. Johnson and his ex-wife after they separated. She denied discussing false allegations concerning her mother with Mr. Johnson. She identified a Father's Day card she sent Mr. Johnson commenting on his values and love for his family. She stated that court proceedings over her allegations had been going on for five years. She agreed that she had previously accused her mother of abusing her. She agreed she had written to the Friend of the Court asking to live with Defendant after her parents separated.

Roseville Police officer Jason Otto testified that he was on a regular patrol at around 8:00 pm on January 15, 2005, and driving through the parking lot of the Continental Lanes bowling alley when he noticed a car parked in the lot with its motor running. The first time he passed the vehicle, he noticed an adult male sitting in the driver's seat, and the second time he drove by he saw a male youth in the front passenger seat. When he circled around behind the car, he was no longer able to see the child. He then shined his spotlight on the car, and went to the driver's window to investigate. According to the officer, as he walked up to the driver's window he could see the child leaning over the driver, with his head in the driver's lap, and could see that the driver's pants were unzipped. He ordered the driver, who he identified as Mr. Johnson, out of the vehicle, called for backup, and had Defendant sit in his patrol car. He only spoke to Defendant briefly, prior to his supervisor arriving at the scene. Defendant told him he was just sitting in the car with his son, doing Bible study and praying.

On cross-examination, Officer Otto acknowledged there was no physical evidence found to corroborate his alleged observations at the scene. He agreed that he approached the car quickly, that Defendant and his son appeared surprised by his presence, and that there was no time for Defendant and his son to make up a story concerning their activities before Mr. Johnson was ordered out of the car.

Officer David Raymer responded to the scene to back up Officer Otto. He watched over David while Mr. Johnson sat in the back of Officer Otto's squad car. He indicated to the officer that he was on a visitation with his father, and they had come to the bowling alley. Officer Raymer also testified that he had responded to the call at Rotary Park, and while there recognized Defendant and David Johnson from the previous incident.

On cross-examination Officer Raymer admitted that any ten year old child probably would have been nervous under the circumstances in the parking lot.

Lt. Raymond Blarek testified that he responded to the call from the parking lot. He stated that he asked Officer Otto if he had actually seen David Johnson's mouth on Defendant's penis, and was told no. When he asked Defendant what he had been doing in the car, Defendant told him that he was homeless and living in the car, and had custody of his son for three days each week. He denied any improper contact with his son, stating that he had only hugged him while they were praying. When the witness went up to the car, he stated its interior was in "total disarray," as

8

if someone was living in the vehicle. He questioned David Johnson. Lt. Blarek then had an officer drive David to his mother's house.

Lt. Blarek was also at the scene at Rotary Park in May. He watched as other officers interviewed people at the scene.

On cross-examination Lt. Blarek acknowledged that he did not personally see any evidence of wrongdoing at either the parking lot in January or at the park in May. At the park, Defendant appeared calm and David was acting like a typical ten year old. At the bowling alley parking lot, Defendant's and his son's statements were consistent with each other.

Officer Eric Boucher testified that the picnic table was at most 104 feet away from the area where Ms. Goss and the Terlisners were sitting.

Det. Brad McKenzie testified that he arrived at the park around two to three minutes after the radio call went out, and saw Defendant and his son near the swingset. He then spoke to the witnesses. On cross-examination the officer asserted that witness Sheletha Jones told him she saw Defendant touching the boy's penis, and that this statement was reflected in his police report on the incident. According to the officer, Ms. Jones told him this occurred for around 15 to 20 minutes.

Det. Clifford Van Der Linden testified that no charges were brought against Mr. Johnson concerning the incident in the parking lot of the bowling alley. He agreed that David Johnson consistently told the police that Defendant had not inappropriately touched him on either occasion.

Officer Stephan Dzierzwski testified he responded to the call from Rotary Park with Det. McKenzie. While at the park, he spoke briefly to Mr. Johnson and David. He referred to David as appearing to him to be acting in a normal manner and demeanor.

At this point of the trial, at the request of the defense, the jury was shown tape recordings of the interviews with David Johnson at Care House in January and June, 200[5].

After the prosecution rested, the defense presented testimony from two witnesses. Robert Schumann, who worked at Care House, testified he was present when David Johnson was interviewed in January, 2005. According to Mr. Schumann, in his opinion David appeared to be having a hard time discussing the incident and seemed to be hiding something. Mr. Schumann, who had a master's degree specializing in childhood sexual abuse, stated that David avoided eye contact and was evasive when the topic of sexual abuse was brought up. He agreed there was no physical evidence of any abuse.

Mr. Johnson then recalled Det. Van Der Linden to the stand. He indicated that in his report he had indicated that he believed David was "very convincing" during his Care House interview. On cross-examination, the witness stated that he felt that David was protecting someone.

The case then proceeded to the closing arguments and jury instructions. The jury convicted Mr. Johnson on both charged offenses.

Def.-Appellant's Br. on Appeal, in *People v. Johnson*, No. 270444 (Mich. Ct. App.), at 5-14

(citations to trial transcript omitted).

C.      *Standard of Review*

Because petitioner's application was filed after April 24, 1996, his petition is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (Apr. 24, 1996).  *See Lindh v. Murphy*, 521 U.S. 320, 326-27 (1997). Amongst other amendments, the AEDPA amended the substantive standards for granting habeas relief by providing:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

"[T]he 'contrary to' and 'unreasonable application' clauses [have] independent meaning." *Williams v. Taylor*, 529 U.S. 362, 405 (2000); *see also*, *Bell v. Cone*, 535 U.S. 685, 694 (2002). "A state court's decision is 'contrary to' . . . clearly established law if it 'applies a rule that contradicts the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [this] precedent.'" *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003) (per curiam) (quoting *Williams*, 529 U.S. at 405-06); *see also*, *Early v. Packer*, 537 U.S. 3, 8 (2002); *Bell*, 535 U.S. at 694. "[T]he 'unreasonable application' prong of § 2254(d)(1) permits a federal habeas court to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme]

10

Court but unreasonably applies that principle to the facts' of petitioner's case." *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) (quoting *Williams*, 529 U.S. at 413); *see also*, *Bell*, 535 U.S. at 694. However, "[i]n order for a federal court to find a state court's application of [Supreme Court] precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous.  The state court's application must have been 'objectively unreasonable.'" *Wiggins*, 539 U.S. at 520-21 (citations omitted); *see also*, *Williams*, 529 U.S. at 409.

By its terms, § 2254(d)(1) limits a federal habeas court's review to a determination of whether the state court's decision comports with "clearly established federal law as determined by the Supreme Court."  Thus, "§ 2254(d)(1) restricts the source of clearly established law to [the Supreme] Court's jurisprudence."  *Williams*, 529 U.S. at 412.  Further, the "phrase 'refers to the holdings, as opposed to the dicta, of [the] Court's decisions as of the time of the relevant state-court decision.'  In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003) (citations omitted) (quoting *Williams*, 529 U.S. at 412).

Although "clearly established Federal law as determined by the Supreme Court" is the benchmark for habeas review of a state court decision, the standard set forth in § 2254(d) "does not require citation of [Supreme Court] cases–indeed, it does not even require *awareness* of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them."  *Early*, 537 U.S. at 8; *see also*, *Mitchell*, 540 U.S. at 16.  Further, although the requirements of "clearly established law" are to be determined solely by the holdings of the Supreme Court, the decisions of lower federal courts are useful in assessing the reasonableness of the state court's

11

resolution of an issue.  *See Williams v. Bowersox*, 340 F.3d 667, 671 (8th Cir. 2003); *Phoenix v. Matesanz*, 233 F.3d 77, 83 n.3 (1st Cir. 2000); *Dickens v. Jones*, 203 F. Supp.2d 354, 359 (E.D. Mich. 2002) (Tarnow, J.).

D.     *Self-Representation (Claim I)*

Petitioner first contends that he was denied his Sixth Amendment right to the assistance of counsel by the trial court's improper acceptance of his waiver of counsel.  The Court should conclude that petitioner is not entitled to habeas relief on this claim.

1.     *Clearly Established Law*

The Sixth Amendment, applicable to the states through the Fourteenth Amendment Due Process Clause, provides that a criminal defendant shall have the right to the assistance of counsel in his defense.  *See* U.S. CONST. amend. VI.  This right necessarily implies its corollary, that a defendant has a right to proceed without counsel and represent himself.  *See Martinez v. Court of Appeal of Cal., Fourth Appellate Dist.*, 528 U.S. 152, 154 (2000); *Faretta v. California*, 422 U.S. 806, 833-34 (1975).  The right to assistance of counsel and the right to self-representation are thus correlative rights; the assertion of one necessarily constitutes a waiver of the other.  *See United States v. Conder*, 423 F.2d 904, 908 (6th Cir. 1970).  Nevertheless, a defendant's waiver of his right to counsel and decision to proceed *pro se* must be knowing and intelligent.  *See Faretta*, 422 U.S. at 835; *Carnley v. Cochran*, 369 U.S. 506, 516 (1962).  As the Supreme Court explained, in order for the defendant's decision to be knowing and voluntary, "he should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that 'he knows what he is doing and his choice is made with eyes open.'" *Faretta*, 422 U.S. at 835 (quoting *Adams v. United States ex rel. McCann*, 317 U.S. 269, 279 (1942)).  However, the Supreme Court has "not prescribed

12

any formula or script to be read to a defendant who states that he elects to proceed without counsel," *Iowa v. Tovar*, 541 U.S. 77, 88 (2004), and there is "no sacrosanct litany for warning defendants against waiving the right to counsel." *United States v. Jones*, 421 F.3d 359, 363 (5th Cir. 2005). Rather, the adequacy of a defendant's waiver is determined from the facts and circumstances of the case. *See Tovar*, 541 U.S. at 88.

  2. *Analysis*

  Petitioner first requested to represent himself at trial at a motion hearing on November 14, 2005. Specifically, petitioner did not object to his appointed counsel, Cyril Pessina, representing him for the motions, but requested that he be allowed to conduct the trial himself, with Mr. Pessina serving as standby counsel. *See* Mot. Hr'g Tr., dated 11/14/05, at 4. The trial court indicated that petitioner had the right to represent himself at trial, but warned him to familiarize himself with the rules of evidence because he could not be allowed to turn the courtroom into a circus. *See id.* At a hearing on November 22, counsel requested that petitioner be evaluated for his competence to be tried. The trial court denied this motion. At this hearing, petitioner successfully argued on his own behalf for various items of discovery to be turned over. *See* Mot. Hr'g Tr., dated 11/22/05, at 4-8. Trial commenced with jury selection on January 11, 2006. At that time, petitioner again indicated that he would be representing himself. *See* Trial Tr., Vol. I, at 6. The court asked petitioner, "[d]o you know how foolish that is?" Petitioner responded, "I've heard." *Id.* The court explained that Mr. Pessina would be there only in an advisory capacity, but that petitioner would be "representing [him]self in the totality of the case." The court then stated, "[n]ow, I am telling you that that is a mistake." *Id.* at 7. The court further stated, "And I would hope that you would reconsider and allow him to proceed with your defense, although, you can exercise your constitutional right to represent

13

yourself." *Id*. Petitioner again indicated his desire to represent himself, and the court informed him that he would "be held to the strict standards of all of the Rules of Evidence." *Id*. The parties then discussed a possible plea offer, and began jury selection. Petitioner conducted the jury selection himself, both questioning venire members and exercising challenges. The following day, petitioner reconsidered his decision and requested that Mr. Pessina be allowed to represent him. Mr. Pessina indicated that he had prepared only to assist petitioner, and therefore was not prepared to conduct the trial. The court agreed to adjourn the trial to March 7, 2006, and a lengthy discussion ensued between the parties as to whether the jury could be discharged without implicating double jeopardy concerns, or whether the trial could simply be continued on that date before the same jury. The trial court ultimately concluded that the jury should be retained and the trial continued. *See* Trial Tr., Vol. II.

Petitioner through counsel subsequently filed a motion for a mistrial, seeking to discharge the jury and agreeing that the subsequent impaneling of a new jury would not raise any double jeopardy problems. Petitioner argued that because he was now represented by counsel, he was entitled to have the jury selected by counsel. The trial court initially indicated that it would grant this motion. *See* Mot. Hr'g Tr., dated 1/30/06, at 1-5. Trial counsel then requested permission to withdraw, stating that there had been a breakdown in communication. *See id*. at 7-8. Petitioner responded by asking to again represent himself. *See id*. at 10-11. Because petitioner would again be representing himself, the trial court denied the motion for mistrial. *See id*. at 13. The parties again appeared for trial on March 7, 2006. At that time, the court asked petitioner whether he would be representing himself or Mr. Pessina would be representing him. Petitioner responded that "I will be representing myself, your Honor." Trial Tr., Vol. III, at 3. The court then asked petitioner: "So

14

you understand the drawbacks of representing yourself?  Obviously, you're not educated in the law, there are going to be objects [sic] made, and I want you to understand that by representing yourself you could be making a mistake because of your inability to be educated – or not your inability, but your lack of education in the law.  Do you understand that?"  *Id*.  Petitioner indicated that he understood.  *See id*.  The court explained that Mr. Pessina would be available to answer petitioner's questions, "[b]ut you will be totally representing yourself, am I correct?"  *Id*. at 4.  Petitioner responded, "Yes, ma'am."  *Id*.  The court informed petitioner that Mr. Pessina was ready to proceed, but petitioner indicated that "I think this is my place," and stated that it was in his "best interest" to represent himself.  *Id*.  Trial then proceeded, with petitioner representing himself at all stages, including during cross-examination of the victim.

On appeal petitioner argued, as he does here, that the trial court failed to assure that his waiver of counsel was knowing and voluntary, and failed to comply with the requirements for accepting a waiver of counsel under Michigan Court Rule 6.005(D).  The Michigan Court of Appeals rejected these claims.  With respect to petitioner's claim that the trial court had failed to adequately inform him of the dangers of self-representation, the court of appeals noted that: (1) petitioner's request to represent himself came several months before trial was actually held; (2) the trial court informed petitioner that he would be required to abide by the rules of evidence; (3) on the first day of jury selection the court informed petitioner that self representation would be "foolish" and a mistake, and again cautioned petitioner that he would be held to the rules of evidence; (4) when petitioner changed his mind and requested counsel after jury selection was completed, the court told petitioner that this decision was "wise;" (5) at the January 30 hearing, when petitioner again requested to represent himself, petitioner indicated that he understood the consequences of that

choice; and (6) prior to the presentation of the case on March 7, the court again informed petitioner of the "drawbacks" to self-representation based on his lack of legal training. Based on these factors, the court of appeals concluded that "the trial court substantially complied with the requirement that it inform defendant of the risks involved in self-representation." *Johnson*, 2007 WL 3033950, at *2. The court of appeals further held that the trial court had substantially complied with the requirements of Rule 6.005(D). *See id*. at *2-*3. The court should conclude that these determinations were reasonable.

First, petitioner's assertion that the trial court failed to comply with state law in allowing him to waive his right to counsel does not entitle him to habeas relief. In the first place, the Michigan Court of Appeals concluded that the trial court did comply with Rule 6.005(D), and this determination of state law is binding on this Court. *See Sarausad v. Porter*, 503 F.3d 822, 824 (9th Cir. 2007) ("A determination of state law by a state appellate court is . . . binding in a federal habeas action."). And, even if the trial court did fail to comply with Rule 6.005(D), this would not provide a basis for habeas relief. As noted above, there is no particular inquiry or litany of questions which a trial court must perform as a matter of federal constitutional law, and any failure of the trial court to comply with Rule 6.005(D) would raise solely an issue of state law for which habeas review is not available. *See Smith v. Smith*, No. 05-CV-74045-DT, 2007 WL 1585653, at *6 (E.D. Mich. May 31, 2007) (Hood, J.); *Howell v. Rubitschun*, No. 04-CV-71975, 2005 WL 2319012, at *7 (E.D. Mich. Sept. 20, 2005) (Steeh, J.). *See generally*, *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("Today, we reemphasize that it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.").

Turning to the constitutional issue, the Michigan Court of Appeals's determination that

16

petitioner's waiver of counsel was knowing, voluntary, and intelligent was reasonable. As noted above, there is no particular formula that a court must recite in accepting a defendant's waiver of counsel, *see Tovar*, 541 U.S. at 88, nor is a state court required to conduct any particular "searching inquiry" into the basis of defendant's waiver, *see Payne*, 207 F. Supp. 2d at 644. All that is required is that a defendant be apprised of the dangers of proceeding without counsel. Here, the record shows that petitioner was well aware of these dangers. The trial court repeatedly informed petitioner that he would be required to abide by the rules of evidence, and warned petitioner that he was unschooled in the law. The trial court also informed petitioner that deciding to proceed without counsel would be "foolish" and a mistake. Further, petitioner had several months in which to contemplate whether he wished to proceed with counsel or represent himself. In addition, although not required to do so the trial court inquired before the start of each day of trial to ensure that petitioner wished to continue representing himself. *See* Trial Tr., dated 3/9/06, at 4-5; *id.*, dated 3/10/06, at 3. The trial transcript demonstrates that petitioner was well prepared to represent himself, making an opening statement and closing argument and questioning the witnesses at trial. In these circumstances, the Michigan Court of Appeals did not unreasonably apply clearly established law in concluding that petitioner's waiver of counsel was knowing, intelligent, and voluntary. *See, e.g.*, *United States v. Mahasin*, 442 F.3d 687, 691-92 (8th Cir. 2006); *United States v. McKenzie*, 160 Fed. Appx. 821, 826-27 (11th Cir. 2005); *United States v. McDowell*, 814 F.2d 245, 247-49 (6th Cir. 1987); *Payne*, 207 F. Supp. 2d at 644. Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

E.     *Other Acts Evidence (Claim II)*

          Petitioner next contends that he was denied a fair trial by the introduction of evidence that

he had committed prior sexual assault on both his daughter and the victim. The Michigan Court of Appeals rejected petitioner's claim, concluding that the evidence of petitioner's "past sexual abuse of his son and daughter [was offered] for the proper purpose of proving [petitioner's] common plan or scheme used to choose his victims and carry out his assaults." *Johnson*, 2007 WL 3033950, at *4. The court of appeals also rejected petitioner's argument that the prior acts were not sufficiently similar to the charged act to be relevant. *See id*. The Court should conclude that petitioner is not entitled to habeas relief on this claim.

It is well established that habeas corpus is not available to remedy a state court's error in the application of state law. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("Today, we reemphasize that it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."); *Jackson v. Ylst*, 921 F.2d 882, 885 (9th Cir. 1990) (a federal court on habeas review "ha[s] no authority to review a state's application of its own laws."). Thus, unless a violation of a state's evidentiary rule results in the denial of fundamental fairness, and issue concerning the admissibility of evidence does not rise to the level of a constitutional magnitude. *See Cooper v. Sowders*, 837 F.2d 284, 286 (6th Cir. 1988); *Davis v. Jabe*, 824 F.2d 483, 487 (6th Cir. 1987). "[A] federal habeas court has nothing whatsoever to do with reviewing a state court ruling on the admissibility of evidence under state law. State evidentiary law simply has no effect on [a court's] review of the constitutionality of a trial, unless it is asserted that the state law itself violates the Constitution." *Pemberton v. Collins*, 991 F.2d 1218, 1223 (5th Cir. 1993). As the Sixth Circuit has noted, "[e]rrors by a state court in the admission of evidence are not cognizable in habeas proceedings unless they so perniciously affect the prosecution of a criminal case as to deny the defendant the fundamental right to a fair trial." *Kelly v. Withrow*, 25 F.3d 363, 370 (6th Cir.

18

1994).  In short, "[o]nly when the evidentiary ruling impinges on a specific constitutional protection or is so prejudicial that it amounts to a denial of due process may a court grant habeas corpus remedy." *Barrett v. Acevado*, 169 F.3d 1155, 1163 (8th Cir. 1999); *see also*, *Coleman v. Mitchell*, 244 F.3d 533, 542 (6th Cir. 2001).  Where a specific constitutional right—such as the right to confront witnesses or to present a defense—is not implicated, federal habeas relief is available only if the allegedly erroneously admitted evidence "is totally unreliable and . . . the factfinder and the adversary system will not be competent to uncover, recognize, and take due account of its shortcomings." *Barefoot v. Estelle*, 463 U.S. 880, 899 (1983).

As noted above, the issue here is not whether this evidence was properly admitted under the Michigan Rules of Evidence, but rather whether petitioner was denied a fair trial by the introduction of this evidence.  Both the Supreme Court and the Sixth Circuit have repeatedly held that a defendant is not denied a fair trial by the admission of prior bad acts evidence which is relevant in the defendant's trial.  *See Estelle*, 502 U.S. at 69-70; *Dowling v. United States*, 493 U.S. 342, 353-54 (1990); *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003); *Coleman v. Mitchell*, 268 F.3d 417, 439-40 (6th Cir. 2001).  Here, the evidence of petitioner's prior assaults was relevant for the proper purpose of showing petitioner's common scheme in carrying out his assaults.  Further, the trial court properly instructed the jury that this evidence could be considered only for this purpose, and that the jury should not use the evidence to convict petitioner because he was a bad person or was guilty of another, uncharged crime.  *See* Trial Tr., dated 3/10/06, at 41-42. Because this evidence was relevant for a proper purpose and the jury was properly instructed, and because "[t]here is no clearly established Supreme Court precedent which holds that a state violates due process by permitting propensity evidence in the form of other bad acts evidence," *Bugh*, 329 F.3d at 512, the Court should

19

conclude that petitioner is not entitled to habeas relief on this claim.

F.      *Prosecutorial Misconduct (Claim III)*

Petitioner next contends that he was denied a fair trial by prosecutorial misconduct. From a thorough review of petitioner's lengthy reply brief, it appears that petitioner's prosecutorial misconduct claims fall into three categories: (1) improper statements during closing argument; (2) presentation of perjured testimony; and (3) suppression of exculpatory evidence. The Court should conclude that petitioner is not entitled to habeas relief on these claims.

1.      *Improper Statements*

Petitioner first contends that the prosecutor committed misconduct by vouching for the credibility of the witnesses. The Court should reject this claim.

*a. Clearly Established Law*

For habeas relief to be warranted on the basis of prosecutorial misconduct, it is not enough that the prosecutor's conduct was "undesirable or even universally condemned." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986). Rather, the misconduct must have "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Id*. (internal quotation omitted). "[T]he touchstone of due process analysis . . . is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219 (1982). In determining whether the prosecutor's conduct was so egregious as to warrant habeas relief, a court should consider "the degree to which the remarks complained of have a tendency to mislead the jury and to prejudice the accused; whether they are isolated or extensive; whether they were deliberately or accidentally placed before the jury; and the strength of the competent proof to establish the guilt of the accused." *Pritchett v. Pitcher*, 117 F.3d 959, 964 (6th Cir. 1997) (internal quotations and citations omitted).

20

In sum, to constitute a denial of due process the prosecutor's conduct must be "so pronounced and persistent that it permeates the entire atmosphere of the trial." *Id.* (internal quotation omitted).

Improper vouching occurs either (1) "when a prosecutor supports the credibility of a witness by indicating a personal belief in the witness's credibility thereby placing the prestige of the [prosecutor's office] behind that witness," or (2) through "comments that imply that the prosecutor has special knowledge of facts not in front of the jury." *United States v. Francis*, 170 F.3d 546, 550 (6th Cir. 1999); *see also*, *United States v. Emuegbunam*, 268 F.3d 377, 404 (6th Cir. 2001).[2]

### b. Analysis

Petitioner contends that the prosecutor improperly vouched for the credibility of the witnesses during closing and rebuttal argument. *See* Reply (part I), docket #26, at 6, 20, 22.[3] During closing argument, the prosecutor stated:

> Lashawanda, Karen, Robert, and Sheletha, all took the stand in front of you and testified to something that happened over a year ago and they testified to things that stood out in their mind. They did it honestly. They did it without prompting and they had no reason, other than the protection of the child to come in and tell you what they told you. They didn't know this man. They could care less about this man, one way or the other. They have no vendetta against this man right here, other than the fact that they were appalled at what they saw at the park that day.

Trial Tr., dated 3/10/06, at 7. Later, during rebuttal argument, the prosecutor stated, "Ladies and gentlemen, the witnesses testified clearly, without any motivation, without any malice, for no other reason than protection of that child." *Id.* at 33.

These comments do not constitute impermissible vouching. Although the prosecutor stated

---

[2]Some cases referring to only the first type of comment as "vouching" and describe the second type of comment as "bolstering." *See Francis*, 170 F.3d at 551.

[3]Because petitioner's reply is not sequentially paginated, and uses a system of both numbers and letters, to avoid confusion I refer to the pagination provided by the Court's docketing system.

that the witnesses testified honestly, at no time did she suggest that she personally believed the witnesses or that she had knowledge of facts not before the jury.  Rather, in context it is clear that the prosecutor was arguing that the witnesses were worthy of belief because their testimony was clear and consistent, and because they had no animosity toward petitioner or motive to lie.  "[W]here a prosecutor argues that a witness is being truthful based on the testimony given at trial, and does not assure the jury that the credibility of the witness is based on his own personal knowledge, the prosecutor is engaging in proper argument and is not vouching." *United States v. Walker*, 155 F.3d 180, 187 (3d Cir. 1998).  Further, the prosecutor was free to comment that the jury should use its common sense in evaluating the credibility of the witnesses.  *See Walker*, 155 F.3d at 187; *see also*, *Nichols v. Scott*, 69 F.3d 1255, 1283 (5th Cir. 1995) (comment "is permissible to the extent that it draws a conclusion based solely on the evidence presented.") (internal quotation omitted); *United States v. Grey Bear*, 883 F.2d 1382, 1392 (8th Cir. 1989); *Martin v. Foltz*, 773 F.2d 711, 717 (6th Cir. 1985) (prosecutor may argue permissible inferences from the evidence); *United States ex rel. Williams v. Washington*, 913 F. Supp. 1156, 1163 (N.D. Ill. 1995) (prosecutor's assertion during closing argument that the defendant had "lied" did not deprive petitioner of a fair trial where "the prosecution's statements were reasonable inferences drawn from the physical evidence and witness testimony[.]").

Petitioner also contends that the prosecutor misstated the facts when she stated, regarding the testimony of the witnesses: "The common factor that all four of them said, there was no Bible reading going on that day.  That Bible was not open, there was no Bible reading, this was a pretext – or appeared to be a pretext used and I believe the evidence shows that."  Trial Tr., dated 3/10/06, at 9.  Petitioner is correct that, in part, this statement was inaccurate.  Both Karen Terlisner and

22

Lashawanda Goss testified that petitioner did not open or read from the Bible that he had with him. *See* Trial Tr., dated 3/8/06, at 20, 79-80. Neither Robert Terlisner nor Sheletha Jones so testified, contrary to the prosecutor's statement. However, neither did either of these witnesses testify that petitioner had in fact read from the Bible; they simply provided no testimony as to this fact one way or the other. Based on the fact that two of the four witnesses in fact testified as the prosecutor claimed, and the other two did not testify to the contrary, the prosecutor's "misstatement has earmarks of inadvertent mistake, not misconduct." *United States v. Carillo*, 16 F.3d 1046, 1050 (9th Cir. 1994). Further, the jury was properly instructed that it was the sole judge of the facts, and that the arguments of counsel were not evidence, limiting the prejudicial impact of the prosecutor's statements. *See id*. at 1051. Finally, the misstatement was a brief mention, the Bible issue did not play any further part in the prosecutor's closing argument or in defendant's argument, and whether the Bible had been opened or not was only tangentially related to whether the witness's observations of petitioner's conduct was credible. Thus, petitioner cannot show that he was denied a fair trial by the prosecutor's misstatement.

### 2. *Perjured Testimony*

Petitioner next contends that the prosecution presented perjured testimony. The Court should conclude that petitioner is not entitled to habeas relief on this claim.

### a. *Clearly Established Law*

It is well established that "a conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *United States v. Agurs*, 427 U.S. 97, 103 (1976) (footnote omitted); *accord Napue v. Illinois*, 360 U.S. 264, 271 (1959). This is true whether

the false testimony goes to the defendant's guilt or to a witness's credibility, *see Napue*, 360 U.S. at 270, and it matters not whether the prosecution directly elicits the false testimony or merely allows false testimony to go uncorrected, *see id*. at 269.  It is equally well established, however, that petitioner bears the burden of proving that the testimony amounted to perjury.  As the Fourth Circuit has explained, "[a] defendant seeking to vacate a conviction based on perjured testimony must show that the testimony was, indeed, perjured.  Mere inconsistencies in testimony by government witnesses do not establish the government's knowing use of false testimony."  *United States v. Griley*, 814 F.2d 967, 971 (4th Cir. 1987); *accord United States v. Verser*, 916 F.2d 1268, 1271 (7th Cir. 1990) ("[N]ot every testimonial inconsistency that goes uncorrected by the government establishes a constitutional violation."); *Horton v. United States*, 983 F. Supp. 650, 657 (E.D. Va. 1997); *United States v. Hearst*, 424 F. Supp. 307, 318 (N.D. Cal. 1976).  Thus, to succeed on this claim petitioner must show that: (1) the prosecutor presented evidence which was false; (2) the prosecutor knew of the falsity; and (3) the evidence was material.  *See Coe v. Bell*, 161 F.3d 320, 343 (6th Cir. 1999).  As the *Verser* court further explained, to establish a constitutional violation petitioner must show that the "inconsistent testimony amounted to perjury, 'the willful assertion under oath of a false, material fact.'" *Verser*, 916 F.2d at 1271 (quoting *Carey v. Duckworth*, 738 F.2d 875, 878 (7th Cir. 1984)); *see also*, *Horton*, 983 F. Supp. at 657 (quoting *United States v. Smith*, 62 F.3d 641, 646 (4th Cir. 1995)) (in order to establish *Napue* violation defendant must show that the government knowingly used perjured testimony, perjury being "false testimony concerning a material matter, 'given with the willful intent to deceive (rather than as a result of, say, confusion, mistake, or faulty memory.'").  In other words, petitioner must show that the testimony was "indisputably false."  *Byrd v. Collins*, 209 F.3d 486, 817-18 (6th Cir. 2000).

24

*b. Analysis*

Petitioner contends that the witnesses testified falsely because their testimony at trial contradicted testimony they gave at the preliminary examination regarding whether he was reading from the Bible while at the park with his son. Petitioner also contends that Sheletha Jones's testimony was false, because she alone testified to having seen petitioner rub his son's penis. Finally, petitioner contends that Sheletha Jones's testimony was false because she was testifying under an assumed name, her real last name being Poole. Because petitioner cannot show that any of the testimony was indisputably false, he is not entitled to habeas relief on this claim.

Petitioner essentially contends that the witnesses testified falsely at trial because some of their testimony contradicted their testimony at the preliminary examination, or because it contradicted other witnesses, in particular with respect to whether he was reading his Bible at the table in the park. *See* Reply (part II), docket #26-1, at 10. As noted above, only Goss and Karen Terlisner testified at trial that petitioner did not open the Bible while in the park. At the preliminary examination, Goss initially testified that petitioner did not open the Bible and that she did not observe him reading from it. *See* Prelim. Exam. Tr., at 14. On cross-examination, Goss testified that petitioner in fact opened the Bible, but she could not tell if he read from it and did observe that the victim never looked at the Bible. *See id.* at 26. Thus, although Goss was not clear on whether the Bible was opened, petitioner cannot show that her trial testimony was "indisputably false" and thus amounted to perjury, and the prior inconsistent testimony was presented to the jury for its use in evaluating the credibility of Goss. With respect to Karen Terlisner, she testified at the preliminary examination, consistent with her trial testimony, that petitioner took the Bible out but never read from it. *See id.* at 45. Thus, petitioner cannot show that her testimony was false.

25

Petitioner also contends that Sheletha Jones testified falsely because she testified under an assumed name, her real last name being Poole. *See* Reply (part I), docket # 26, at 46-50. Petitioner argues that the only explanation for Jones's use of an alias was to shield herself from civil and criminal liability, and that the jury would have found her not credible, and thus acquitted him, if it knew that Jones was testifying under a false name. *See* Reply (part II), docket #26-1, at 5-6. This claim is without merit, because the jury was informed of Jones's real last name. *See* Trial Tr., dated 3/9/06, at 10. Further, petitioner's contention that the only reason for Jones to use an "alias" was to avoid civil or criminal liability is without merit. Petitioner does not explain what potential civil or criminal liability Jones might have been facing that she hoped to avoid by using a different last name, and Jones herself explained why she used "Jones" instead of "Poole"–namely, because that was the last name of her boyfriend, who was the father of her children, and thus the name used by her children. *See id*. at 10. Thus, petitioner has failed to show that allowing Jones to testify under that name deprived him of a fair trial or constituted perjured testimony.

Petitioner next contends that Officer Otto testified falsely, regarding the January 2005 incident, that he observed the victim's head on petitioner's lap. Petitioner contends that the falsity of this testimony was demonstrated by Lt. Blarek's testimony. *See* Reply (part I), docket #26, at 26-29. This claim is likewise without merit. Lt. Blarek testified that after the January 2005 incident, he asked Officer Otto what the latter had seen. After Officer Otto described what he had seen, Lt. Blarek asked him directly whether he had observed the victim's mouth on petitioner's penis, and Officer Otto responded that he had not. *See* Trial Tr., dated 3/7/06, at 123. This testimony, however did not contradict Officer Otto's testimony. Officer Otto testified that as he approached the car, he observed the victim's head buried in the petitioner's groin, and when the victim lifted his head

petitioner's zipper was opened.  *See id.* at 97.  However, at no point did Officer Otto testify that he saw the victim's mouth on petitioner's penis, and there is nothing contradictory in Officer Otto having observed the victim's head in petitioner's groin area but not actually seeing whether or not the victim's mouth touched petitioner's penis.  Thus, petitioner has failed to offer anything to show that Officer Otto's testimony was "indisputably false."

Finally, petitioner contends that Detective Van Der Linden testified falsely when he testified that he believed, based on the victim's interview at Care House, that the victim was protecting someone.  Petitioner argues that if Detective Van Der Linden had really believed this, he would have arrested petitioner or someone else whom the detective thought the victim was protecting.  *See* Reply (part I), docket #26, at 35-36; Reply (part IV), docket #26-3, at 4.  Petitioner cannot show that Detective Van Der Linden's testimony was false, however, because Van Der Linden testified to his opinions, not facts.  The subject first came up on petitioner's cross-examination of Detective Van Der Linden, when petitioner asked whether the group involved in the Care House interview in January came to any conclusions regarding the veracity of the victim, who had denied any abuse. Detective Van Der Linden stated, "we thought he was being sexually assaulted."  Trial Tr., dated 3/8/06, at 236.  On redirect examination, Detective Van Der Linden further testified that they thought the victim was being truthful as to what the victim thought had happened, but that they thought the victim was protecting someone.  He further explained that charges were not brought because of a lack of evidence, not because he did not believe that petitioner had sexually assaulted the victim.  *See id.* at 237-38.  Thus, Detective Van Der Linden did not testify as to any facts, only as to his own impressions and opinions, a line of inquiry begun by petitioner himself.  Petitioner cannot show that this testimony amounted to perjury, because impressions and opinions, by their

27

very nature, cannot be "indisputably false."

In short, petitioner has failed to show that the prosecutor presented any testimony at trial which she knew to be "indisputably false." Petitioner is therefore not entitled to habeas relief on this claim.

### 3. *Suppression of Exculpatory Evidence*

Petitioner also appears to argue that the prosecution deprived him of a fair trial by suppressing exculpatory evidence. The Court should conclude that petitioner is not entitled to habeas relief on this claim.

#### *a. Clearly Established Law*

The Due Process Clause requires the state to disclose exculpatory evidence to the defense. *See Brady v. Maryland*, 373 U.S. 83 (1963). "There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). Thus, in order to establish a *Brady* claim, petitioner must show that: (1) evidence was suppressed by the prosecution in that it was not known to petitioner and not available from another source; (2) the evidence was favorable or exculpatory; and (3) the evidence was material to the question of petitioner's guilt. *See Carter v. Bell*, 218 F.3d 581, 601 (6th Cir. 2000); *Luton v. Grandison*, 44 F.3d 626, 628-29 (8th Cir. 1994); *see also*, *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999); *Moore v. Illinois*, 408 U.S. 786, 794-95 (1972). Petitioner bears the burden of establishing each of these three elements. *See Carter*, 218 F.3d at 601. Further, although *Brady* requires disclosure of exculpatory evidence, it is well established, that "*Brady* . . . does not require the government to create

28

exculpatory material that does not exist." *United States v. Sukumolachan*, 610 F.2d 685, 687 (9th Cir. 1980); *see also*, *Richards v. Solem*, 693 F.2d 760,766 (8th Cir. 1982) ("Although the state has a duty to disclose evidence, it does not have a duty to create evidence.").

### b. Analysis

For the most part, petitioner makes only vague, generalized assertions that he was not provided with discovery materials or that the prosecution suppressed evidence. These conclusory assertions do not entitle petitioner to habeas relief. To the extent petitioner makes a generalized claim that evidence was suppressed, it is well established that "[c]onclusory allegations that the government 'suppressed' or 'concealed' evidence do not entitle [petitioner] to relief; nor do they suffice to entitle [petitioner] to an evidentiary hearing on whether documents were withheld." *Harris v. United States*, 9 F. Supp. 2d 246, 275 (S.D.N.Y. 1998), *aff'd*, 216 F.3d 1072 (2d Cir. 2000); *see also*, *United States v. Winkelman*, 548 F. Supp. 2d 142, 153 (M.D. Pa. 2008). Likewise, to the extent petitioner bases his claim on the prosecutor's failure to provide discovery required by state law or court order, the claim is not a basis for habeas relief. As noted above, petitioner had no constitutional right to discovery, *see Weatherford*, 429 U.S. at 559, and he therefore cannot establish his entitlement to habeas relief merely by demonstrating that the prosecution failed to provide discovery information in violation of a court order. Any violation of the state law discovery rules raises an issue not cognizable on habeas review. *See Lorraine v. Coyle*, 291 F.3d 416, 441 (6th Cir. 2002); *Burns v. Lafler*, 328 F. Supp. 2d 711, 723 (E.D. Mich. 2004) (Gadola, J.); *Meade v. Lavigne*, 265 F. Supp. 2d 849, 867 (E.D. Mich. 2003) (Tarnow, J.). Rather, petitioner must show that he was deprived of material, exculpatory information by the prosecution's omission. Petitioner has failed to make this showing.

29

Petitioner identifies only two specific items of evidence that he contends were withheld. First, he contends that the prosecution withheld Sheletha Jones's real last name. However, as discussed above, this information came out at trial. Because the purpose of *Brady* is to permit a defendant to put all exculpatory information before the jury, "*Brady* generally does not apply to delayed disclosure of exculpatory information, but only to a complete failure to disclose." *United States v. Davis*, 306 F.3d 398, 421 (6th Cir. 2002) (internal quotation omitted). Even where "previously undisclosed evidence is disclosed . . . during trial, no *Brady* violation occurs unless the defendant has been prejudiced by the delay in disclosure." *Norris v. Schotten*, 146 F.3d 314, 334 (6th Cir. 1998) (internal quotation omitted); *accord Davis*, 306 F.3d at 421 ("Delay violates *Brady* only where the delay causes prejudice."); *United States v. Bencs*, 28 F.3d 555, 560-61 (6th Cir. 1994). Here, petitioner has not shown how he was prejudiced by the delayed disclosure of Jones's real last name. He does not identify any further lines of inquiry or impeachment that knowledge of Jones's true last name would have provided, nor has he explained how prior knowledge of her true last name would have revealed any exculpatory information. Thus, petitioner is not entitled to habeas relief on this claim.

Petitioner also contends that the prosecution suppressed one or more witness statements, because at a pretrial hearing the officer in charge held up five or six witness statements, but he had received only four. *See* Reply (part II), docket #26-1, at 6-7, 22. The record, however, does not provide any basis to believe that there were more than four witness statements. It was petitioner himself who indicated that the officer in charge held up what appeared to be five sheets of paper and said there were five or six statements. *See* Mot. Hr'g Tr., dated 11/22/05, at 5-6. Upon questioning by the court, however, Detective Van Der Linden indicated that there were only four witness

30

statements, consistent with the number of witnesses who testified at trial. *See id.* at 6-7. Apart from petitioner's own assertions regarding the number of pages the officer held up, there is absolutely nothing in the record that shows there were additional witness statements, much less that any such statements contained exculpatory evidence. Thus, petitioner is not entitled to habeas relief on this claim.

G.    *Newly Discovered Evidence (Claim IV)*

Petitioner next contends that he is entitled to habeas relief because he has newly discovered evidence that establishes his innocence. The Court should conclude that petitioner is not entitled to habeas relief on this claim, for two reasons.

First, petitioner's claim does not set forth a cognizable basis for habeas relief. A writ of habeas corpus may be granted "only on the ground that [the petitioner] is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Thus, the existence of new evidence, standing alone, is not a basis for granting the writ. As the Supreme Court has explained: "Claims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding." *Herrera v. Collins*, 506 U.S. 390, 400 (1993); *see also*, *id.* at 404 (claim of actual innocence is "not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise [procedurally] barred *constitutional* claim considered on the merits.") (emphasis added); *Schlup v. Delo*, 513 U.S. 298, 314-16 (distinguishing, in part, *Herrera* because in this case the petitioner "accompanie[d] his claim of innocence with an assertion of constitutional error at trial."); *Townsend v. Sain*, 372 U.S. 293, 317 (1963) ("Of course, such evidence must bear upon the constitutionality of the applicant's detention;

31

the existence merely of newly discovered evidence relevant to the guilt of a state prisoner is not a ground for relief on federal habeas corpus."), *overruled in part on other grounds*, *Keeney v. Tamayo-Reyes*, 504 U.S. 1 (1992).  Thus, the newly discovered evidence, standing alone, provides no basis for habeas relief.

Further, even if such a claim were cognizable, petitioner's evidence falls far short of that necessary to establish that he is innocent.  In *Herrera*, without elaborating further, the Court noted that even if a free-standing claim of innocence were cognizable on habeas review, "the threshold showing for such an assumed right would necessarily be extraordinarily high."  *Herrera*, 506 U.S. at 417.  In *Schlup*, the Court elaborated on the showing required to establish "actual innocence" for purposes of overcoming a procedural bar to consideration of a constitutional claim.  The Court explained that, to establish actual innocence, the petitioner must "show that a constitutional violation has probably resulted in the conviction of one who is actually innocent.  To establish the requisite probability, the petitioner must show that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence."  *Schulup*, 513 U.S. at 327 (internal citation and quotation omitted).

The Supreme Court has also explained that a petitioner cannot establish his actual innocence merely be rehashing his innocence claims raised in the state courts and relying on the evidence adduced at trial.  If he could, federal habeas review would become nothing more than a second trial on the merits, something the Supreme Court has repeatedly admonished the federal courts to avoid.  *See Milton v. Wainwright*, 407 U.S. 371, 377 (1972) ("The writ of habeas corpus has limited scope; the federal courts do not sit to re-try state cases *de novo*[.]").  Thus, "to be credible, [a claim of actual innocence] requires petitioner to support his allegations of constitutional error

with new reliable evidence that was not presented at trial." *Schlup*, 513 U.S. at 324. "Examples of evidence which may establish factual innocence include credible declarations of guilt by another, trustworthy eyewitness accounts, and exculpatory scientific evidence." *Pitts v. Norris*, 85 F.3d 348, 350-51 (8th Cir. 1996) (citations omitted); *accord Schlup*, 513 U.S. at 324 (referring to "exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence").

Here, petitioner's actual innocence claim is not based on any new, reliable evidence. Rather, it is based on petitioner's newly constructed analysis of the testimony at the preliminary examination and trial. Petitioner's reply brief makes this plain, explaining that his newly discovered evidence consists of the preliminary examination and trial transcripts, *see* Reply (part III), docket #26-2, at 10, and indeed petitioner's entire actual innocence argument reads as if it is a newly constructed closing argument based on the evidence adduced at trial. *See id.* at 17-28. As noted above, an actual innocence claim requires new evidence, not merely petitioner's new analysis of the evidence that the jury considered. Thus, even if such a claim were cognizable, petitioner has failed to present any new evidence showing that he is actually innocent.

To the extent petitioner is really attempting to argue that the evidence was insufficient to sustain his conviction for CSC-II, in addition to being unexhausted the claim is without merit. The Due Process Clause of the Fourteenth Amendment "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In Re Winship*, 397 U.S. 358, 364 (1970). Reviewing courts must view the evidence, draw inferences and resolve conflicting inferences from the record in favor of the prosecution. *See Neal v. Morris*, 972 F.2d 675, 678 (6th Cir. 1992). In determining the sufficiency

33

of the evidence, the court must give circumstantial evidence the same weight as direct evidence. *See United States v. Farley*, 2 F.3d 645, 650 (6th Cir. 1993). While a challenge to the sufficiency of the evidence on an established element of an offense raises a federal constitutional claim cognizable in a habeas corpus proceeding, *see Jackson*, 443 U.S. at 324, "[t]he applicability of the reasonable doubt standard . . . has always been dependent on how a State defines the offense that is charged in any given case." *Patterson v. New York*, 432 U.S. 197, 211 n.12 (1977); *see also*, *Jackson*, 443 U.S. at 324 n.16; *Mullaney v. Wilbur*, 421 U.S. 684, 691 (1975). Thus, "[a] federal court must look to state law to determine the elements of the crime." *Quartararo v. Hanslmaier*, 186 F.3d 91, 97 (2d Cir. 1999).

As relevant to petitioner's case, the CSC-II statute provides: "[a] person is guilty of criminal sexual conduct in the second degree if the person engages in sexual contact with another person and . . . [t]hat other person is under 13 years of age." MICH. COMP. LAWS § 750.520c(1)(a). Under the CSC-II statute, "sexual contact" is defined as "the intentional touching of the victim's or actor's intimate parts or the intentional touching of the clothing covering the immediate area of the victim's or actor's intimate parts, if that intentional touching can reasonably be construed as being for the purpose of sexual arousal or gratification, done for a sexual purpose, or in a sexual manner for: (i) Revenge. (ii) To inflict humiliation. (iii) Out of anger." MICH. COMP. LAWS § 750.520a(q). Here, the prosecution presented sufficient evidence to establish these elements. There was no question that the victim was under 13 years of age at the time of the offence. Further, the testimony of Sheletha Jones, if believed by the jury, established that petitioner touched the clothing covering the victim's penis. And the testimony of other witnesses that petitioner kissed the victim in a sexual manner and was rubbing his own penis through his clothes establish that the sexual contact was done

for the purpose of sexual arousal or in a sexual manner.

Petitioner contends that there was no evidence of his guilt because the victim testified that he was not sexually assaulted, there was no physical evidence to support the charge, and Sheletha Jones's testimony was not credible. These factors do not render insufficient the testimony which otherwise established the elements of the offense. It is well-established that a reviewing court, whether on direct appeal or habeas review, "do[es] not make credibility determinations in evaluating the sufficiency of the evidence." *United States v. Owusu*, 199 F.3d 329, 344 (6th Cir. 2000); *Walker v. Russell*, 57 F.2d 472, 475-76 (6th Cir. 1995); *see also*, *United States v. Bailey*, 444 U.S. 394, 414-15 (1980) ("It is for [jurors] and not for appellate courts to say that a particular witness spoke the truth or fabricated a cock-and-bull story."). "The fact that the testimony is contradictory does not mean that evidence is insufficient, only that the jury must make credibility determinations." *Government of the Virgin Islands v. Isaac*, 50 F.3d 1175, 1179 (3d Cir. 1995). It is the job of the jury, not this Court sitting on habeas review, to resolve conflicts in the evidence, and this Court must presume that the jury resolved those conflicts in favor of the prosecution. *See Jackson*, 443 U.S. at 326; *United States v. Sherwood*, 98 F.3d 402, 408 (9th Cir. 1996). Thus, petitioner's attacks on the credibility of Jones do not demonstrate that the evidence was insufficient. Likewise, the evidence is not rendered insufficient because there was no physical evidence tying petitioner to the crime. "Lack of physical evidence does not render the evidence that is presented insufficient." *United States v. Magallanez*, 408 F.3d 672, 681 (10th Cir.2005); *see also*, *O'Hara v. Brigano*, 499 F. 3d 492, 500 (6th Cir. 2007) (victim's testimony alone sufficient even though not corroborated by other witnesses or physical evidence); *United States v. Bieghler*, 198 Fed. Appx. 566, 568 (8th Cir. 2006) ("'[F]orensic evidence' is not required for conviction.").

35

Finally, the fact that the victim testified that no crime occurred does not render the evidence constitutionally insufficient. As with any other witness, the jury is free to accept or reject all or part of a victim's testimony. Here the eyewitnesses, if believed by the jury, provided sufficient evidence to prove petitioner's guilt beyond a reasonable doubt. "As the exclusive judge of the credibility of the witnesses, the jury was free to reject the victim's attempt to protect [his] abuser." *Baltrip v. State*, No. 09-93-256, 1994 WL 590169, at *1 (Tex. Ct. App. Oct. 26, 1994); *see also*, *United States v. Persing*, 436 Fed. Appx. 13, 18 (2d Cir. 2011). Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on the basis of newly discovered evidence.

H.    *Ineffective Assistance of Appellate Counsel (Claim V)*

Finally, petitioner contends that his appellate counsel was constitutionally ineffective for failing to raise his prosecutorial misconduct and newly discovered evidence claims in the Michigan Court of Appeals. The Court should conclude that petitioner is not entitled to habeas relief on this claim.

1.    *Clearly Established Law*

The Sixth Amendment right to counsel and the right to effective assistance of counsel protect the fundamental right to a fair trial. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). To establish the ineffective assistance of counsel, petitioner must show that: (1) counsel's errors were so serious that "counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment;" and (2) counsel's deficient performance prejudiced the defense. *Id*. at 687. These two components are mixed  questions of law and fact. *Id*. at 698. Further, "[t]here is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one." *Id.* at 697. If "it is easier to dispose of an

36

ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." *Id.* With respect to the performance prong of the *Strickland* test, a strong presumption exists that counsel's behavior lies within the wide range of reasonable professional assistance. *See id*. at 689; *see also O'Hara v. Wigginton*, 24 F.3d 823, 828 (6th Cir. 1994). "[D]efendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland*, 466 U.S. at 689 (citation omitted). "[T]he court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id*. at 690. With respect to the prejudice prong, the reviewing court must determine, based on the totality of the evidence before the factfinder, "whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id*. at 695. It is petitioner's burden to establish the elements of his ineffective assistance of counsel claim. *See United States v. Pierce*, 63 F.3d 818, 833 (6th Cir. 1995) (petitioner bears the burden of establishing counsel's ineffectiveness); *Lewis v. Alexander*, 11 F.3d 1349, 1352 (6th Cir. 1993) (same).

As the Supreme Court has recently explained, *Strickland* establishes a high burden that is difficult to meet, made more so when the deference required by § 2254(d)(1) is applied to review a state court's application of *Strickland*:

> "Surmounting Strickland's high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. ----, ----, 130 S.Ct. 1473, 1485, 176 L.Ed.2d 284 (2010). An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the Strickland standard must be applied with scrupulous care, lest "intrusive post-trial inquiry" threaten the integrity of the very adversary process the right to counsel is meant to serve. *Strickland*, 466 U.S., at 689-690, 104 S.Ct. 2052. Even under *de novo* review, the standard for judging counsel's representation is a most deferential one. Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with

37

the judge. It is "all too tempting" to "second-guess counsel's assistance after conviction or adverse sentence." *Id*., at 689, 104 S.Ct. 2052; *see also Bell v. Cone*, 535 U.S. 685, 702, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002); *Lockhart v. Fretwell*, 506 U.S. 364, 372, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993). The question is whether an attorney's representation amounted to incompetence under "prevailing professional norms," not whether it deviated from best practices or most common custom. *Strickland*, 466 U.S., at 690, 104 S.Ct. 2052.

Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult. The standards created by *Strickland* and § 2254(d) are both "highly deferential," *id*., at 689, 104 S.Ct. 2052; *Lindh v. Murphy*, 521 U.S. 320, 333, n. 7, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997), and when the two apply in tandem, review is "doubly" so, *Knowles*, 556 U.S., at ----, 129 S.Ct. at 1420. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. 556 U.S., at ----, 129 S.Ct. at 1420 . Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard.

*Harrington v. Richter*, 131 S. Ct. 770, 788 (2011).

In evaluating the performance of appellate counsel, it is well established that "appellate counsel . . . need not (and should not) raise every nonfrivolous claim, but rather may select from among them in order to maximize the likelihood of success on appeal." *Smith v. Robbins*, 528 U.S. 259, 288 (2000) (citing *Jones v. Barnes*, 463 U.S. 745 (1983)). Although it is "possible to bring a *Strickland* claim based on counsel's failure to raise a particular claim, . . . it is difficult to demonstrate that counsel was incompetent." *Id*. As a general rule, it is "'only when ignored issues are clearly stronger than those presented [that] the presumption of effective assistance of counsel [can] be overcome.'" *Id*. (quoting *Gray v. Greer*, 800 F.2d 644, 646 (7th Cir. 1986)). Further, in the appellate counsel context, to demonstrate prejudice petitioner must show a reasonable probability that his claims would have succeeded on appeal. *See id*. at 285-86; *Benning v. Warden*, 345 Fed. Appx. 149, 155-56 (6th Cir. 2009); *McCleese v. United States*, 75 F.3d 1174, 1180 (7th Cir. 1996).

2.     *Analysis*

Petitioner cannot show that counsel was ineffective for failing to raise his prosecutorial misconduct and newly discovered evidence claims on appeal, or that he was prejudiced by counsel's failure to do so.   Counsel presented three substantial issues on direct appeal, one of which was successful and resulted in the reversal of one of petitioner's two convictions.   Further, as explained above, petitioner's prosecutorial misconduct and newly discovered evidence claims are without merit.   Thus, petitioner cannot show that he was denied the effective assistance of appellate counsel.

I.     *Evidentiary Hearing, Discovery, and Investigative Assistance*

In his reply brief, petitioner seeks an evidentiary hearing and discovery.   Further, in a separately filed motion, petitioner seeks investigative assistance, presumably to uncover evidence of his innocence.   The Court should conclude that petitioner is not entitled to an evidentiary hearing, discovery, or investigative assistance.

"A habeas petitioner, unlike the usual civil litigant, is not entitled to discovery as a matter of ordinary course." *Bracy v. Gramley*, 520 U.S. 899, 904 (1997).   Rather, a petitioner is entitled to discovery only if the district judge "in the exercise of his discretion and for good cause shown grants leave" to conduct discovery.   Rule 6, Rules Governing Section 2254 Cases in the United States District Courts, 28 U.S.C. foll. § 2254.   In order to establish "good cause" for discovery, petitioner must establish that the requested discovery will develop facts which will enable him to demonstrate that he is entitled to habeas relief.   *See Bracy*, 520 U.S. at 908-09.   The burden is on the petitioner to establish the materiality of the requested discovery.   *See Stanford v. Parker*, 266 F.3d 442, 460 (6th Cir. 2001).

In addressing whether an evidentiary hearing is appropriate in a habeas corpus case, a court

must consider two separate issues: (1) is an evidentiary hearing necessary under Rule 8 of the Rules Governing Section 2254 Proceedings in United States District Courts, 28 U.S.C. foll. § 2254; and (2) is a hearing is permitted under 28 U.S.C. § 2254(e)(2).  In deciding whether an evidentiary hearing is necessary under  Rule 8, "courts focus on whether a new evidentiary hearing would be meaningful, in that a new hearing would have the potential to advance the petitioner's claim." *Campbell v. Vaughn*, 209 F.3d 280, 287 (3d Cir. 2000) (discussing *Cardwell v. Greene*, 152 F.3d 331, 338 (4th Cir. 1998)); *see also*, *Alcorn v. Smith*, 781 F.2d 58, 59-60 (6th Cir. 1986) (applying pre-AEDPA law); *cf. Townsend v. Sain*, 372 U.S. 293, 312-13 (1963).  As the Supreme Court recently explained:

> In deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief. Because the deferential standards prescribed by § 2254 control whether to grant habeas relief, a federal court must take into account those standards in deciding whether an evidentiary hearing is appropriate.
> It follows that if the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing.

*Schriro v. Landrigan*, 550 U.S. 465, 474 (2007) (citations and footnote omitted).

Here, petitioner cannot establish good cause for discovery or that an evidentiary hearing would have the potential to advance his claims.  For the most part, petitioner seeks discovery and a hearing to advance his claim that he is actually innocent.  As noted above, however, this is not a cognizable basis for habeas relief, and thus neither discovery nor an evidentiary hearing is appropriate.  The bulk of petitioner's remaining claims may be resolved on the basis of the record. Petitioner's jury waiver and other acts evidence claims, as well as his claim challenging the prosecutor's comments at trial, depend solely on the record at trial.  Likewise, the resolution of

petitioner's ineffective assistance of appellate counsel claim is governed by the claims raised by counsel and the merit of the claims petitioner contends counsel should have raised, a resolution that cannot be advanced through further factual development. Although theoretically additional evidence could support a claim that the prosecutor presented perjured testimony or suppressed evidence, petitioner's perjury and suppression claims here are based solely on inconsistencies in the trial testimony, and petitioner does not point specifically to any additional evidence that discovery or an evidentiary hearing could uncover in support of these claims. Speculative allegations are insufficient to entitle a petitioner to an evidentiary hearing. *See Getsy v. Mitchell*, 495 F.3d 295, 312 (6th Cir. 2007); *Young v. Herring*, 938 F.2d 543, 560 & n.12 (5th Cir. 1991). Petitioner's "'bald assertions and conclusory allegations do not provide sufficient ground to warrant requiring . . . an evidentiary hearing.'" *Washington v. Renico*, 455 F.3d 722, 733 (6th Cir. 2006) (quoting *Stanford v. Parker*, 266 F.3d 442, 460 (6th Cir. 2001)). Accordingly, the Court should deny petitioner's motion for investigative assistance and his requests for discovery and an evidentiary hearing.

J.    *Recommendation Regarding Certificate of Appealability*

1.    *Legal Standard*

As amended by the Antiterrorism and Effective Death Penalty Act, section 2253 provides that a petitioner may not appeal a denial of an application for a writ of habeas corpus unless a judge issues a certificate of appealability. *See* 28 U.S.C. § 2253(c)(1). The statute further provides that "[a] certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). As the Sixth Circuit has noted, this language represents a codification of the Supreme Court's decision in *Barefoot v. Estelle*, 463 U.S. 880 (1983), and "[t]he AEDPA thus makes no change to the general showing required to obtain a

41

certificate[.]" *Lyons v. Ohio Adult Parole Auth.*, 105 F.3d 1063, 1073 (6th Cir. 1997); *accord Slack v. McDaniel*, 529 U.S. 473, 483 (2000).  Although the statute does not define what constitutes a "substantial showing" of a denial of a constitutional right, the burden on the petitioner is obviously less than the burden for establishing entitlement to the writ; otherwise, a certificate could never issue.  Rather, the courts that have considered the issue have concluded that "'[a] substantial showing requires the applicant to "demonstrate that the issues are debatable among jurists of reason; that a court could resolve the issues (in a different manner); or that the questions are adequate to deserve encouragement to proceed further."'" *Hicks v. Johnson*, 186 F.3d 634, 636 (5th Cir. 1999) (quoting *Drinkard v. Johnson*, 97 F.3d 751, 755 (5th Cir. 1996) (quoting *Barefoot*, 463 U.S. at 893 n.4)); *accord Slack*, 529 U.S. at 483-84.  Although the substantive standard is the same, "[t]he new Act does, however, require that certificates of appealability, unlike the former certificates of probable cause, specify which issues are appealable."  *Lyons*, 105 F.3d at 1073. (citing 28 U.S.C. § 2253(c)(3)).

Effective December 1, 2009, the newly created Rule 11 of the Rules Governing Section 2254 Cases in the United States District Courts, 28 U.S.C. foll. § 2254, provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rule 11(a), 28 U.S.C. foll. § 2254.  The rule tracks § 2253(c)(3)'s requirement that any grant of a certificate of appealability "state the specific issue or issues that satisfy the showing required by § 2253(c)(2)," Rule 11(a), but omits the requirement contained in the pre-amendment version of Federal Rule of Appellate Procedure 22(b)(1) that the court explain "why a certificate should not issue."  FED. R. APP. P. 22(b)(1) (version effective prior to 2009 amendment); *see id.*, advisory committee note, 2009 amendments.  In light of the new Rule 11 requirement that the Court either

grant or deny the certificate of appealability at the time of its final adverse order, I include a recommendation regarding the certificate of appealability issue here.

       2.    *Analysis*

If the Court accepts my recommendation regarding the merits of petitioner's claims, the Court should also conclude that petitioner is not entitled to an evidentiary hearing. With respect to petitioner's jury waiver claim, the record shows that the trial court repeatedly warned petitioner of the dangers of self-representation, and advised petitioner to proceed with counsel. Thus, the resolution of this claim is not reasonably debatable. With respect to petitioner's other acts and newly discovered evidence claims, it is well established that such claims do not present a cognizable basis for habeas review, and thus the resolution of these claims is not reasonably debatable. With respect to petitioner's prosecutorial misconduct claims, the trial record establishes that the prosecutor's comments were either proper or not prejudicial, and petitioner has failed to point to anything that suggests that the prosecutor knowingly presented perjured testimony or suppressed evidence. Thus, the resolution of petitioner's prosecutorial misconduct claims is not reasonably debatable. Finally, because appellate counsel presented substantial, non-frivolous issues on appeal, including an issue that resulted in the reversal of one of petitioner's convictions, and because petitioner's prosecutorial misconduct and newly discovered evidence claims are without merit, the resolution of petitioner's ineffective assistance of appellate counsel claim is not reasonably debatable. Accordingly, the Court should deny petitioner a certificate of appealability.

K.    *Conclusion*

In view of the foregoing, the Court should conclude that the state courts' resolution of petitioner's claims did not result in a decision which was contrary to, or which involved an

unreasonable application of, clearly established federal law.  Accordingly, the Court should deny petitioner's application for the writ of habeas corpus.  The Court should also deny petitioner's motion for investigative assistance.  Finally, if the Court accepts this recommendation, the Court should deny petitioner a certificate of appealability.

III.    NOTICE TO PARTIES REGARDING OBJECTIONS:

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in FED. R. CIV. P. 72(b)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation.  *See Willis v. Secretary of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991). *Smith v. Detroit Federation of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court.  The response shall address specifically, and in the same order raised, each issue contained within the objections.


s/Paul J. Komives_____
PAUL J. KOMIVES
UNITED STATES MAGISTRATE JUDGE

Dated: 12/14/11

The undersigned certifies that a copy of the foregoing order was served on the attorneys of record and  by electronic means or U.S. Mail on December 14,  2011.

s/Eddrey Butts
Case Manager